Argued and submitted December 2, 1987, decision of the Court of Appeal reversed and
decision of the trial court affirmed July 6, 1988

## MILLERS MUTUAL FIRE INSURANCE COMPANY OF TEXAS,
*Plaintiff,*

*v.*

## WILDISH CONSTRUCTION COMPANY,
*Petitioner/Cross-Respondent on Review,*

*and*

## BARNES et ux,
*Respondents/Cross-Petitioners on Review.*

(TC 82-4537-J-2; CA A37930;
SC S33913, S34064)

758 P2d 836

Michael H. Long, Eugene, argued the cause for petitioner/cross-respondent on review. With him on the petition was Flinn, Brown & Roseta, Eugene.

Sidney E. Ainsworth, Ashland, argued the cause for respondents/cross-petitioners on review. On the brief and response were Jack Davis and Davis, Ainsworth, Pinnock, Davis & Gilstrap, P.C., Ashland.

CAMPBELL, J.

Jones, J., concurred and filed an opinion.

Linde, J., dissented and filed an opinion in which Lent, J., joined.

Gillette, J., dissented and filed an opinion.

## CAMPBELL, J.

This case involves a cross-claim filed by the defendants Barneses against the defendant Wildish Construction Company for damages caused to their residence by the construction company's blasting operations. At the close of the Barneses' case-in-chief the trial court allowed Wildish Construction's motion for a directed verdict on the grounds that the Barneses had not offered any proof under the proper measure of damages. The Barneses appealed to the Court of Appeals, which reversed and remanded. *Millers Mut. Fire Ins. Co. v. Wildish Const. Co.*, 84 Or App 464, 734 P2d 890 (1987).

Wildish Construction filed a petition for review in this court claiming that the Court of Appeals erred: (1) In allowing the Barneses to argue for the first time on appeal that there was legally sufficient evidence from which the jury could determine the diminution in the fair market value of the residence resulting from the blasting; and (2) in holding that there was such evidence in the Barneses' case-in-chief in the trial court.

The Barneses also filed a petition for review requesting that we modify the Court of Appeals' decision by remanding the case to the trial court with instructions that the correct measure of damages resulting from the blasting is the cost of restoration of the residence and not the diminution in value. We allowed both petitions for review. We reverse the decision of the Court of Appeals and affirm the decision of the trial court.

To understand and decide the above issues it is necessary to review the evidence. We do so in the light most favorable to the Barneses. *Wiggins v. Barrett & Associates, Inc.*, 295 Or 679, 669 P2d 1132 (1983).

In 1976 the Barneses purchased a house and lot on the Rogue River in Shady Cove in Jackson County. The house was on two levels and was approximately 3,800 square feet in size. It was constructed in 1952. It was unusual in that both the exterior perimeter walls and the interior partition walls were built with concrete blocks. The Barneses intended to make the house their retirement home.

In April 1980, Wildish Construction began blasting with explosives along the Rogue River near the Barneses'

property in connection with the installation of the Shady Cove sewer system. Wildish Construction's insurance company inspected the Barneses' house before the blasting started. The representative of the insurance company found no problems and stated: "I can't believe it. This house is built like a fortress. I found two cracks." The blasting in the area of the Barneses' property continued off and on through January 1981. The ground upon which the Barneses' house was located was disturbed by the blasting and began to settle. At first the Barneses thought that their house had been severely damaged but could be repaired. The insurance carrier for the Barneses was the plaintiff, The Millers Mutual Fire Insurance Company of Texas. It arranged with a contractor to repair the damage to the Barneses' property.

Later, after extensive repairs did not stop the water leaks and the cracking continued, the Barneses reached the conclusion that the house would have to be razed and rebuilt from scratch. One civil engineer testified that the settling of the house could not be stopped and that the only way to solve the problem was to build a new structure. He testified that to replace the 3,800 square foot house with concrete block construction would cost $60 per square foot, or $228,000, and to replace it with a wood structure would cost $45 per square foot, or $171,000. Another engineer, who was the Director of Medford's Building Department, testified that the damage was impossible to repair. He stated that the house was "sophisticated rubble" and that attempting to repair it would be like having a "ten dollar saddle on a five dollar horse."

Wildish Construction, on cross-examination of a witness who testified for the Barneses, introduced two separate proofs of loss, signed at different times, in which the Barneses swore that the "actual cash value of said property involved at the time of the loss was $168,000" and that the "whole loss and damage" was the same amount.

In December 1982, Millers Mutual filed its complaint in this case against Wildish Construction, seeking to recover approximately $60,000 that it had paid under its policy for the "damage and depreciation" of the Barneses' property resulting from Wildish Construction's blasting operations. The Barneses were joined as defendants because they refused to

assign their claim against Wildish Construction to the plaintiff.

In the due course of events, the Barneses filed a SECOND AMENDED ANSWER AND CROSS CLAIM against Wildish Construction for damages in excess of the insurance payments. The cross-claim in part alleged:

"Defendants BARNES were damaged by said ultrahazardous activity of Defendant WILDISH CONSTRUCTION CO. in the amount of $228,000, representing the cost of replacement of the subject residence. The sum of $16,271.50 was expended by Defendants BARNES in a good faith effort to repair the subject residence and the structure is not repairable.

"V.

"In the alternative, in the event that the cost of replacement of the structure is not the proper measure of said Defendants' damages, Defendants BARNES were damaged in the sum of $103,000.00, representing the diminution in the fair market value of the subject residence as a result of Defendant WILDISH CONSTRUCTION CO.'s ultrahazardous activities, together with the costs of $16,271.50 incurred in a good faith effort to repair the residence."

After the trial had started, Millers Mutual and Wildish Construction reached a settlement. The complaint against Wildish Construction was dismissed and the trial proceeded on the Barneses' cross-claim against Wildish Construction.

On the fourth day of the trial, after the Barneses had rested, Wildish Construction moved for a directed verdict on the grounds that the proper measure of damages was the diminution in the fair market value of the property and that the Barneses had not offered any evidence under that standard. The trial court granted the motion and dismissed the cross-claim of the Barneses with prejudice.

The Barneses appealed to the Court of Appeals, alleging that the trial court erred in granting Wildish Construction's motion for a directed verdict. In that court the Barneses argued:

"The cost of restoring the structure is the proper measure of damages in cases such as this where the plaintiff's homestead is involved. The Barnes proved the cost of repair. They presented evidence that restoration of the structure will

involve reconstruction, so the cost of repair here is the cost of replacement.

"The Barnes also proved the diminution in value of the residence even if the cost of replacement were not the proper measure. They presented substantial evidence of the residence's value both before and after the Wildish's excessive blasting."

As to the Barneses' first contention, the Court of Appeals agreed with the trial court and held that when a house is totally destroyed, the measure of damages is the fair market value at the time of the loss. However, the Court of Appeals agreed with the Barneses' last contention and reversed and remanded. *Millers Mut. Fire Ins. Co. v. Wildish Const. Co.,* 84 Or App 464, 734 P2d 890 (1987).

*I. Did the Barneses Argue to the Trial Court that the Proper Measure of Damages was the Diminution in the Market Value of their Residence?*

██ ██     The law is well settled that when a case has been heard on a certain theory in the trial court, it must be so continued on appeal. The parties to an appeal are restricted to the theory upon which the case was tried in the lower court. *Leiser v. Sparkman,* 281 Or 119, 122, 573 P2d 1247 (1978). One of the reasons for the rule is to allow the trial judge an opportunity to correct errors by calling the errors to the trial judge's attention. *Arney, Gohn v. City of North Bend,* 218 Or 471, 475-76, 344 P2d 924 (1959).

In this case there is no question but that Barneses pled as an alternative measure of damages the diminution in the fair market value of their residence. *See* paragraph V of SECOND AMENDED ANSWER AND CROSS CLAIM, *ante* at 106. However, they did not introduce any evidence to support the allegation. The case was not tried on that theory in the trial court.

The proofs of loss, claiming damages in the amount of $168,000, were introduced on cross-examination of one of the Barneses' witnesses by Wildish Construction for the purposes of impeachment, not as substantive evidence. Later, Wayne F. Barnes testified that the $168,000 represented the maximum

limit of his insurance policy with Millers Mutual Fire Insurance Company. Nowhere in the record is there any other reference by any witness that the $168,000 represented the fair market value of the property. The sum of $103,000 alleged in the Barneses' alternative pleading was never mentioned during the evidence at the trial.

On the argument of Wildish Construction's motion for a directed verdict, counsel for the Barneses argued that cost of repair or replacement was the proper measure of damages and that the diminution in the market value was not. A portion of his argument was:

"Now, in that case [*Hanset v. General Construction Company,* 285 Or 101, 589 P2d 1117 (1979),] the court makes clear that where you have a home—a residence, where the owners do not intend to move—that they are not put to the artificial test of showing the before and after value of the home, but can show the costs of repair, which we contend is the same as replacement. And because the Supreme Court has held that the owners of a home are not held to that artificial rule of before and after diminution, and where they clearly state that the rules are clear that the allowance of damages were just compensation without enrichment, there's no universal test for determining the value of property that was destroyed, and the mode and the amount of proof must be adapted to the facts of each case.

"I submit, your Honor, taking the reasoning of the Court in that case, we have a home occupied by owners that have no intention to sell, and we're not to be put to the artificial test of before and after value, but rather can secure—as the Court said—the value of the property injured or destroyed, which is the cost of replacement, your Honor."

The trial judge during the same argument gave the Barneses' counsel every opportunity to argue the diminution in fair market value measure of damages or point out evidence in the record that would support it. Among other things the trial judge said:

"[THE COURT]: What evidence do we have as to the value of this house, in any event? What evidence have you presented as to the value of the house? Could you recap that for me?

"[COUNSEL FOR THE BARNESES]: Yes, your Honor. I had the engineer, Mr. Barrett. I don't recall that he set forth

the value. But Mr. Chemlir stated—and it's in his report —that the cost to replace a structure of this sort would cost $60 a square foot, and I asked him about 3,800 square feet, and he said that was $220,000. He also said, your Honor, that he could replace the structure with a wooden structure—I think he said—for $45 a square foot, and with a properly designed foundation could put a wooden structure back on that location.

"[THE COURT]: You're talking about replacement cost. That's the very thing these cases say you can't do is talk in terms of replacement. We're not talking about benefit of the bargain. They didn't bargain for something, like where you would replace a Chevrolet with a Cadillac, or something of that nature. What they did is; what was that house worth if it was totally destroyed? And of course, that's the before and after. It's worth nothing today. But you'd have to get value before and value after. We have no evidence of repair costs. There's been absolutely no evidence that I can remember. Maybe I was asleep, or something, but I don't remember anything on that issue.

"[COUNSEL FOR THE BARNESES]: It's my position that the cost of repairing the house is replacement, because the experts have said that in their opinion you should not repair this house; it should be replaced, and so the cost of repair is the cost of replacement.

"* * * * *

"And it's our position that the cost of repair and the cost to replace are synonymous, your Honor.

"[THE COURT]: They are not.

"[COUNSEL FOR THE BARNESES]: And they are entitled to have the same sort of residence they had before they started blasting.

"[THE COURT]: But not something better than they had before they started blasting.

"[COUNSEL FOR THE BARNESES]: But how do you do that, your Honor?

"[THE COURT]: What you do is you bring a real estate person in here to say the value of this place in the 1980's and today; its land value plus the cost of tearing the house down, and maybe some expenses there. But we can't say that the house is worth $60 a square foot as it sits there, or 45 or 30 or 20 or whatever.

"[COUNSEL FOR THE BARNESES]: Well, that's what the evidence is.

"[THE COURT]: No they said that's what it would cost to replace a house like that, but they're not saying that the house today is worth that much.

"* * * * *

"And we have no evidence as to what it was worth—absolutely not one iota of evidence in the record * * *. We know what it costs to replace it, but that's not necessarily what it's worth. They may end up with a better product than they had before it was destroyed. It's the same idea, as you well know, where if you go out and destroy your car, they don't replace it with something better. If you had a 1974, they don't replace it with a 1985. They replace it with something of the value of the 1974.

"* * * * *

"I wish we had diminution. I don't have much doubt in my mind that they've been damaged, but unfortunately, I don't think you've got the proper measure of damages * * *. So from this point on, if I allow the trial to go on, I'll just have to end up directing a verdict at the end of the case anyway."

Nowhere in the argument did counsel for the Barneses mention the proofs of loss or argue that the value of the residence before the blasting was $168,000. On oral argument in this court the counsel for the Barneses said that the trial judge cut him off during his argument. After the trial judge allowed the directed verdict the transcript shows that counsel made four separate statements. Three of those statements concerned the cost of repair and none of them mentions the diminution in the fair market value.

There is no question that the Barneses in their pleadings set up diminution in fair market value as a back-up position. But they did not follow through by presenting any evidence to support it. They were unable to point out to the trial judge any evidence of the fair market value of the house immediately prior to the blasting. We hold that the Court of Appeals should not have allowed the Barneses to argue the diminution in fair market value on appeal.

We do not reach the second point of Wildish Construction's petition for review. It is not necessary for us to consider whether there was sufficient evidence in the record to support a diminution in fair market value measure of damages.

We now move to the Barneses' petition for review.

*II. Were the Barneses Entitled to Submit Their Case to the Jury on the Theory that the Measure of Damages was the Cost of Restoration?*

In their petition for review the Barneses put all their eggs in one basket. They claim that the proper measure of damages when a homestead or personal residence has been completely destroyed by tort should be the reasonable cost of replacement and not the diminution or reduction in the fair market value of the residence.

The case presented by the Barneses in the trial court was based upon the proposition that the residence building for the purposes of value was separate and apart from the land or lot upon which it was sitting. Their cross-claim alleged that they were damaged "in the amount of $228,000, representing the cost of replacement of the subject residence." The sum of $228,000 fits with the testimony of the engineer who stated that the cost of replacing the 3,800 square foot house with concrete block construction would be $60 per square foot.

The Barneses strongly rely upon *Hanset v. General Construction Company,* 285 Or 101, 589 P2d 1117 (1979), which in turn cites *Ore. Mutual Fire Ins. Co. v. Mathis,* 215 Or 218, 334 P2d 186 (1959), and comment *b* to Restatement of Torts Section 929 (1939).[1]

---

[1] Restatement (Second) of Torts was adopted and promulgated on May 19, 1977. We have compared Restatement (Second) of Torts Section 929 and its comments *a* and *b* with their counterparts in Restatement of Torts (1939). We find no substantive changes. The reporter's note to the new section states: "The black letter has been reworded in the interest of clarity."

Restatement (Second) of Torts Section 929 (1977) is as follows:

"(1) If one is entitled to a judgment for harm to land resulting from a past invasion and not amounting to a total destruction of value, the damages include compensation for

"(a) the difference between the value of the land before the harm and the value after the harm, or at his election in an appropriate case, the cost of restoration that has been or may be reasonably incurred,

"(b) the loss of use of the land, and

"(c) discomfort and annoyance to him as an occupant.

"(2) If a thing attached to the land but severable from it is damaged, he may at his election recover the loss in value to the thing instead of the damage to the

In their petition for review in this court, the Barneses base their argument on the following premises: (1) Although the *Hanset* case is factually identical to the case at bar in all material respects, the Court of Appeals disagreed and was unwilling to follow *Hanset* because it believed the Barneses' house was damaged beyond repair while the *Hanset* house was repairable. (2) It is well established by *Hudson v. Peavey Oil Co.*, 279 Or 3, 566 P2d 175 (1977), that permanent injury warrants the diminution measure of damages and temporary injury the restoration measure.

The Barneses then divided their argument into two parts. First, the Court of Appeals failed to appreciate the dividing line between "permanent" and "temporary" and that the injuries to the Barneses' house were "temporary" and necessitated the restoration cost measure. In the previous Oregon cases set out in *Hudson*, "permanent injury" was permanent injury to the land while injury to improvements and structures on the land was treated as "temporary injury." They also argued in their petition, "The dispute [in this case] centers on whether the total destruction of a building is temporary or permanent injury to the real property."

The second part of the Barneses' argument is that the Court of Appeals was in error when it held: "The homeowner is not entitled, however, to recover damages in excess of what

---

land as a whole."

Comment *b* to Restatement (Second) of Torts Section 929 (1977) is as follows:

"b. *Restoration.* Even in the absence of value arising from personal use, the reasonable cost of replacing the land in its original position is ordinarily allowable as the measure of recovery. Thus if a ditch is wrongfully dug upon the land of another, the other normally is entitled to damages measured by the expense of filling the ditch, if he wishes it filled. If, however, the cost of replacing the land in its original condition is disproportionate to the diminution in the value of the land caused by the trespass, unless there is a reason personal to the owner for restoring the original condition, damages are measured only by the difference between the value of the land before and after the harm. This would be true, for example, if in trying the effect of explosives, a person were to create large pits upon the comparatively worthless land of another.

"On the other hand, if a building such as a homestead is used for a purpose personal to the owner, the damages ordinarily include an amount for repairs, even though this might be greater than the entire value of the building. So, when a garden has been maintained in a city in connection with a dwelling house, the owner is entitled to recover the expense of putting the garden in its original condition even though the market value of the premises has not been decreased by the defendant's invasion."

he actually lost, that is, he is not entitled to the value of the old home built new." 84 Or App at 470. The Barneses contend that depreciation is not necessarily involved, but if it is an issue, it should have been raised by Wildish Construction in its defense. "The prospect that there is depreciation is not a reason to refuse the award based on replacement cost. It is an adjustment to be made by the jury."

To decide the above issues presented by the Barneses' petition, it is necessary first to review this court's previous decisions on measures of damages for the tortious injury to real property.

*A. Oregon cases before Hanset v. General Construction Company.*

The first reported case in Oregon that we can find on the measure of damages for the tortious injury to real property is *Olds v. Von der Hellen,* 127 Or 276, 263 P 907, 270 P 497 (1928). The plaintiff was the owner of a building that had been constructed by Pacific and Eastern Railroad Company as a depot in Eagle Point in Jackson County. The defendant was storing gasoline in the old depot building, without permission, when it was destroyed by fire. An expert builder testified that it would "cost $5,000 to replace the burned building with a new building of the same kind and class * * * and that in his estimation it had depreciated 20 or 25 per cent." The trial court assessed damages in the amount of $4,000.[2] On appeal, this court stated:

> "We think that, in adopting this measure of damage, the court applied a wrong principle of law and failed to consider other factors which should have entered into the determination of its value. The building was a wooden structure ten years of age and had been built as a railroad depot and for railroad purposes only. The railroad was not in operation and had not been completely constructed and there was nothing to show that there was any likelihood that the building would ever be serviceable for railroad purposes. It was situate at a remote point from any operating railroad and near a very small village

---

[2] At the close of the testimony in the trial court, all parties moved for a directed verdict. Under a procedure that was proper at that time the court discharged the jury, filed findings of fact and conclusions of law, and entered judgment thereon. *Olds v. Von der Hellen,* 127 Or 276, 281, 263 P 907, 270 P 497 (1928). This procedure was later overruled in *Godell v. Johnson,* 244 Or 587, 418 P2d 505 (1966).

and there was nothing to show that the building had any rental value for any purpose. We think that these circumstances should have been considered in determining the question of value.

"* * * We think that under the evidence and the facts and circumstances surrounding the case that the value of the building at the time of the fire did not exceed the sum of $2,500." 127 Or at 288.

*Huber v. Portland Gas and Coke Co.,* 128 Or 363, 274 P 509 (1929), was an action for damages for an alleged trespass by the defendant for maintaining a gas main across the plaintiffs' property. The case was decided by the trial court and affirmed by this court on the basis that the plaintiffs had not properly alleged facts constituting either a permanent or temporary injury. This court quoted Ruling Case Law for the general propositions that the proper measure of damages for permanent injury to real property is the diminution in the market value and that for temporary injury, in many jurisdictions, the proper measure is the reasonable cost of repair. 8 RCL Section 44, 45 Damages.

In *Hanns v. Friedly,* 181 Or 631, 184 P2d 855 (1947), this court affirmed the trial court which enjoined the defendant from the further construction of a road across the plaintiff's property. The plaintiff was also awarded damages in the sum of $250. This court said:

"The measure of damages for permanent injury to real property is the difference between the market value of the property before and after the injury suffered or, in other words, the diminution in market value which the property has sustained by the injury. *Huber v. Portland Gas & Coke Co.,* 128 Or 363, 367, 274 P 509." 181 Or at 642.

*Ore. Mutual Fire Ins. Co. v. Mathis,* 215 Or 218, 334 P2d 186 (1959), was a subrogation action by the plaintiff to recover damages by fire to the Yamhill County Courthouse due to the alleged negligent use of overheated asphalt by the defendant in an attempt to repair the roof. This court stated:

"It appears that, since the allowance of damages is to award just compensation without enrichment, there is no universal test for determining the value of property injured or destroyed and that the mode and amount of proof must be adapted to the facts of each case. 4 Sutherland Damages (4th ed) 3748, § 1015." 215 Or at 224.

In reaching its decision, this court quoted from 25 CJS 604, Damages, Section 84.

"Where the injury to real property is merely temporary, or where the property can be restored to its original condition, the measure of damages may be, or should include, the cost of restoration, as where the injury is susceptible of remedy at a moderate expense and the cost of restoration may be shown with reasonable certainty, or where the cost of restoration is less than the diminution in the value of the property. This is particularly true where the adoption of the difference in value as the measure of damages would be difficult and uncertain, or where the injury is not so much to the land itself as to the improvements thereon. The recovery is limited to the cost of restoring the premises to their original condition and not to that of placing them in better condition than they were in originally. The cost of restoration, however, cannot be adopted, where the cost of restoring the property would exceed the value thereof, or the actual damage sustained by plaintiff, or where restoration is impracticable." 215 Or at 226.

The court also quoted extensively from McCormick, Damages 482 (1935). *See post* at 124-25.

This court concluded that because the cost of repair was far less than the reasonable value of the building, "justice would be served" by allowing the cost of repair.[3]

In *Lemon v. Madden,* 216 Or 539, 340 P2d 977 (1959), the plaintiff brought an action in trespass against the defendant for destroying a line fence between the ranch properties of the parties in Gilliam County. This court affirmed a verdict for the plaintiff and as to the measure of damages said:

"This was not a permanent injury to the real property and the diminution in value to the property would have been unrealistic as well as not legally applicable. *Huber v. Portland Gas & Coke Co.,* 128 Or 363, 274 P 509. In this instance we believe the court properly considered that the measure of damages should be the cost of restoration. McCormick on Damages 482, § 126." 216 Or at 546.

In *Union Pacific Railroad Co. v. Vale, Oregon Irrigation Dist.,* 253 F Supp 251 (D Or 1966), the United States

---

[3] This court commented that a building designed and constructed in 1888 to be used as a courthouse would have no general market value.

District Court for Oregon allowed the plaintiff the sum of $19,138 for damage to its railroad right-of-way and tracks resulting from water escaping from the defendants' irrigation canal. The court said:

"The reasonable cost of restoring the premises, rather than the diminution of its fair market value is the proper measure of damages. *Norwood v. Eastern Oregon Land Co.,* 139 Or 25, 5 P2d 1057, 7 P2d 996 (1932) and *Oregon Mutual Fire Ins. Co. v. Mathis,* 215 Or 218, 334 P2d 186 (1959)."[4]

In *Hudson v. Peavey Oil Company,* 279 Or 3, 566 P2d 175 (1977), the plaintiffs brought an action in trespass against the defendant service station owner claiming damages to their adjoining property resulting from the seepage of gasoline from the defendants' underground storage tanks. The plaintiffs claimed that because of the condition they had been unable to find a tenant for a portion of their property and that the property "might be uninsurable." The plaintiffs' expert testified that it was possible that the condition could last from five to ten years. After a jury verdict for the plaintiffs, the defendant appealed to this court contending there was no evidence that the damage was permanent. In regard to the measure of damages this court said:

"A permanent injury to land justifies an award of damages measured by the resulting diminution in the value of the property. *Furrer v. Talent Irrigation District, supra* at 520; *Hanns v. Friedly,* 181 Or 631, 642, 184 P2d 855 (1947); *Huber et ux v. Portland Gas & Coke Co.,* 128 Or 363, 367, 274 P 509 (1929). Temporary injury, or injury which is reasonably susceptible of repair, justifies damages measured by the loss of use or rental value during the period of the injury, or the cost of restoration, or both, depending on the circumstances. *Lemon v. Madden,* 216 Or 539, 546, 340 P2d 977 (1959); *Huber v. Portland Gas & Coke Co., supra* at 367-68. *See also Ore. Mutual Fire Ins. Co. v. Mathis,* 215 Or 218, 226, 334 P2d 186 (1959). * * *"[5] 279 Or at 10.

This court found that there was evidence from which the jury could have found that the injury was permanent. It explained permanent injury in this manner:

---

[4] *Norwood v. Eastern Oregon Land Co.,* 139 Or 25, 5 P2d 1057, 7 P2d 996 (1932), involved damage to agricultural crops.

[5] *Furrer v. Talent Irrigation District,* 258 Or 494, 466 P2d 605 (1971), involved damage to fruit trees.

"Permanent injury, in this context, merely describes the kind of injury for which a particular measure of damages is appropriate. * * *

"* * * Injury to real property need not be permanent in the sense that it will last forever in order to justify the use of the diminution of value measure of damages. It is enough that the injury be of a kind that makes it appropriate to consider the owner's loss in terms of the reduced value of the property rather than in terms of the cost of restoring it to its original condition. * * *" *Id.*

In *Northwestern Mutual Ins. Co. v. Peterson,* 280 Or 773, 572 P2d 1023 (1977), the plaintiff in a subrogation action sued the defendant for negligence in connection with building a church in Baker. The church was only partly completed when it collapsed during a windstorm. This court reversed the decision of the trial court and remanded to allow the jury to consider the defendant's "Act of God" defense. As to the measure of damages we said: "The cost of repairs may, under certain circumstances, be the proper measure of diminution of value." 280 Or at 782.

The foregoing summary includes all of the pre-*Hanset* cases in this court that we have been able to find on the measure of damages for tortious injury to buildings or fixtures on real property. It seems clear that before *Hanset* this court recognized that the prime goal for the allowance of damages to the owner of a building injured or destroyed by tort was just compensation without enrichment. Although there was no fixed or exclusive rule to determine the amount of damages, this court has generally held that when the injury to real property was permanent, the damages were measured by the difference in value immediately before and immediately after the injury or the diminution-in-value rule. On the other hand, when the injury was temporary the damages were measured by the cost of repairing or restoring the property to the condition that it was in immediately before the injury provided that the cost of repair or restoration did not exceed the pre-tort value of the property. The Barneses in their petition for review recognize that it is "well established" in Oregon that permanent injury and temporary injury to real property warrant different measures of damage. *See ante* at 112.

*Hanns v. Friedly, supra,* and *Hudson v. Peavey Oil*

*Co., supra,* are examples of where this court applied the permanent damage rule. *Ore. Mutual Fire Ins. Co. v. Mathis, supra,* and *Lemon v. Madden, supra,* are examples of the application of the temporary damage rule. There are times when the cost of repair and the diminution in value are the same. *Northwest Mutual Ins. Co. v. Peterson, supra.*

### B. *Hanset v. General Construction Company.*

*Hanset* is a 1979 department case and this court's most recent decision concerning the measure of damages for tortious injury to real property. The Barneses cited *Hanset* to the trial court and have been consistent in relying upon it in the Court of Appeals and this court.

*Hanset* was an action to recover damages to the plaintiffs' home as a result of the defendants' blasting operations. When the plaintiffs purchased the house in 1973 for $5,000, it had been condemned—it was a shell without doors or windows. The plaintiffs did extensive work on the house which included repairing the walls and roof, leveling the floors, fixing the ceilings and paneling several rooms. The defendants' blasting commenced in July 1975. The plaintiffs' house was extensively damaged by the blasting. At trial, the plaintiffs introduced evidence that the cost of repair would be $12,000. They did not introduce any evidence of the value of the house before or after the blasting. The jury awarded the plaintiffs $5,000. The defendant appealed, claiming that the measure of damages should have been the diminution in the value of the house.

The defendant in *Hanset* claimed that *Ore. Mutual Fire Ins. Co. v. Mathis, supra,* was authority to support its position. Instead of agreeing with the defendant, this court grabbed the reins and used the case to affirm the jury award and said:

> "Instead, the case [*Ore. Mutual Fire Ins. Co. v. Mathis*] makes it clear that 'since the allowance of damages is to award just compensation without enrichment, there is no universal test for determining the value of property injured or destroyed and * * * the mode and amount of proof must be adapted to the facts of each case.' 215 Or at 225. * * *
>
> "* * * * *
>
> "We identified several factors that make repair cost, and

not diminution in value, the proper measure of damages, including whether the property can be repaired; whether the damage is to an improvement as opposed to damage to the land itself; and whether the determination of the diminution in value would be difficult and uncertain. 215 Or at 226.

"Under the facts of this case, these factors show that the proper measure of damages in this case is repair cost, not diminution in value." 285 Or at 104.

This court held that the cost of repair was the proper measure of damages. In addition to its analysis of *Ore. Mutual Fire Ins. Co. v. Mathis, supra,* it quoted comment *b* to Restatement of Torts Section 929 (1939), and a portion of *Berg v. Reaction Motors Div.,* 37 NJ 396, 181 A2d 487, 495 (1962).

*C. Did Hanset v. General Construction Company change or expand the law in Oregon?*

The quick answer to the above question is "No."

The Barneses throughout this case have assumed that because this court quoted from comment *b* to Restatement of Torts Section 929 (1939) in *Hanset,* we had approved the comment as well as the entire black letter section that preceded it. In oral argument before this court the Barneses repeatedly argued that their case was a "logical extension" of comment *b.* They focus their attention on the following sentence of that comment:

"On the other hand, if a building such as a homestead is used for a purpose personal to the owner, the damages ordinarily include an amount for repairs, even though this might be greater than the entire value of the building."

The Barneses reason that if an owner whose house is partially destroyed by a tort is allowed damages for repairs that exceed the entire value, then they should be allowed $228,000 for new construction to replace their 28-year-old home with a building of the same design and size.

The Barneses' reliance on Restatement of Torts Section 929 (1939), or its successor, Restatement (Second) of Torts (1977), or comment *b* is misplaced for the following reasons.

First, Restatement (Second) of Torts Section 929 has

a condition precedent which may keep it from applying to the Barneses' situation. The section begins with this language:

> "If one is entitled to a judgment for harm to land resulting from a past invasion *and not amounting to a total destruction of value,* the damages include compensation for: * * *." (Emphasis added.)

It could be argued that "land" means only the earth, ground or soil, but the comments to the section clearly demonstrate that the editors intended that the term should include buildings and other structures affixed to the land.[6]

The Barneses have maintained that their house was totally destroyed in the sense that it must be razed and rebuilt from the ground up. They have also argued that the damage to their house was temporary because the injury was to a structure on the land and not an injury to the land itself. They contend that the new house will be merely a "replacement" or "restoration" of the old one. Although the Barneses contend that this turns upon whether the damage to their house was temporary or permanent, that distinction does not control the application of Restatement (Second) of Torts Section 929. If the damage was temporary or permanent as to a portion of the building, then the Barneses may have that section of the Restatement available to them. On the other side of the coin, if the damage amounts to a "total destruction of value" of their house, then Restatement (Second) of Torts Section 929 kicks out of gear and is not available to them.

The Barneses cannot have it both ways. In *Hudson v. Peavey, supra,* this court said that the injury need not last forever to qualify as permanent damage. 279 Or at 10. If there are degrees of permanence, then the damage to the Barneses' house is more permanent than the damage suffered by the plaintiffs in *Hudson v. Peavey.* If a house is completely torn down so that a new house can be built in its place, the old

---

[6] One definition of "land" set out in Black's Law Dictionary 1019 (4th ed 1951), is as follows:

"'Land' includes not only the soil or earth, but also things of a permanent nature affixed thereto or found therein, whether by nature, as water, trees, grass, herbage, other natural or perennial products, growing crops or trees, mineral under the surface, or by the hand of man, as buildings, fixtures, fences, bridges, as well as works constructed for use of water, such as dikes, canals, etc. *Reynard v. City of Caldwell,* 55 Idaho 342, 42 P2d 292, 296 * * *."

house is gone forever. In the context of this case we hold that there was total destruction of the value of the Barneses' house and that therefore Restatement (Second) of Torts Section 929 cannot apply.[7]

The second reason that the Barneses may not recover under Restatement (Second) of Torts Section 929 is as follows. The mere fact that this court in *Hanset* quoted comment *b* of Restatement of Torts Section 929 (1939) in full and then went on to elaborate on it does not necessarily mean that we have approved it as a part of the Oregon law. In *Brewer v. Erwin*, 287 Or 435, 455 n 12, 600 P2d 398 (1979), this court said:

"Although this court frequently quotes sections of the Restatements of the American Law Institute, it does not literally 'adopt' them in the manner of a legislature enacting, for instance, a draft prepared by the Commissioners on Uniform State Laws, such as the Residential Landlord and Tenant Act. In the nature of common law, such quotations in opinions are

---

[7] If the Barneses desired to rely on the Restatement, then they should have considered Restatement (Second) of Torts Section 927(1), which provides:

"(1) *When one is entitled to a judgment for* the conversion of a chattel or *the destruction* or impairment *of any legally protected interest in land* or other thing, *he may recover* either

"(a) *the value of the subject matter* or of his interest in it *at the time and place of* the conversion, *destruction* or impairment; * * *" (Emphasis added.)

Comment *b* to Restatement (Second) of Torts Section 927 provides:

"*The rule stated in this Section applies in all actions at law,* whether the action is one primarily seeking damages, *as the action for trespass* or conversion, or is one that primarily seeks a return of the subject matter, as the actions or replevin or detinue, if damages are given as an alternative to specific restitution. It also applies to proceedings in equity in which damages are given in lieu of specific restitution." (Emphasis added.)

The term "value" used in Restatement (Second) of Torts Section 927 is defined by Restatement (Second) Torts Section 911 as follows:

"(1) As used in this Chapter, value means exchange value or the value to the owner if this is greater than the exchange value."

Comment *e* to Restatement (Second) of Torts Section 911 states in part:

"Real property may also have a value to the owner greater than its exchange value. Thus a particular location may be valuable to an occupant because of a business reason, as when he has built up good will in a particular neighborhood."

We do not intend to leave the impression that we necessarily would have allowed recovery by the Barneses under Restatement (Second) of Torts Section 927. We merely point out that on the record before us it appears that Restatement (Second) of Torts Section 927 comes closer to fitting the Barneses' situation than Restatement (Second) of Torts Section 929.

no more than shorthand expressions of the court's view that the analysis summarized in the Restatement corresponds to Oregon law applicable to the facts of the case before the court. They do not enact the exact phrasing of the Restatement rule, complete with comments, illustrations, and caveats. Such quotations should not be relied on in briefs as if they committed this court or lower courts to track every detail of the Restatement analysis in other cases. The Restatements themselves purport to be just that, 'restatements' of law found in other sources, although at times they candidly report that the law is in flux and offer a formula preferred on policy grounds."

This court in *Hanset,* after quoting comment *b,* went on to say:

"This comment, particularly the second paragraph, reveals that the *Restatement* supports plaintiffs' position. True, *the comment does state a rule of proportionality under which a plaintiff's damages may be limited to the diminution in value of his property.* However, this rule does not apply where 'there is a reason personal to the owner for restoring the original condition.' As the comment goes on to clarify, where the owner does have a personal reason for restoring the property, as he would where the building is a homestead, 'the damages ordinarily include an amount for repairs, even though this might be greater than the entire value of the building.'" 285 Or at 106.

It is possible that this court under the above-quoted analysis in *Brewer v. Erwin* may have held that at least a part of comment *b* corresponds to Oregon law. If so, then such a holding could be independent, separate and apart from Restatement Torts Section 929. We are referring to the portion of the comment which states that the measure of damages for a homestead ordinarily includes repairs even though they might be *greater than the entire value of the building.* To determine this question it is necessary to re-examine *Hanset.*

A close reading of *Hanset* shows that this court actually decided the case on the basis of *Ore. Mutual Fire Ins. Co. v. Mathis, supra,* and quoted it for the proposition that:

"since the allowance of damages is to award just compensation without enrichment, there is no universal test for determining *the value of property* injured or destroyed and * * * the mode and amount of proof must be adapted to the facts of each case." 285 Or at 104.

The *Hanset* court continued:

"* * * In *Ore. Mutual Fire Ins. Co., supra,* we identified several factors that make repair cost, and not diminution in value, the proper measure of damages, including whether the property can be repaired; whether the damage is to an improvement as opposed to damage to the land itself; and whether the determination of the diminution in value would be difficult and uncertain. 215 Or at 226.

"Under the facts of this case, these factors show that the proper measure of damages in this case is repair cost, not diminution in value." 285 Or at 105.

It is obvious that at that point this court had decided *Hanset* and no further explanation was necessary, but the court in an apparent afterthought to bolster or reinforce its decision, went on to quote comment *b* to Restatement Torts Section 929 (1939) in full and wrote the paragraph which is set out above, without applying it to the case.

The language by this court concerning comment *b* to Restatement of Torts Section 929 (1939) was unnecessary to the decision in *Hanset.*

There is nothing in the opinion or the briefs filed in this court to show that the plaintiffs in *Hanset* recovered damages for repairs that were "greater than the entire value of the building." The Hansets paid $5,000 for the shell of the building, made extensive improvements prior to the tort and were awarded $5,000 by the jury for damages resulting from the defendants' blasting. True, the plaintiffs did seek $12,000 as the cost of repair, but we have no way of knowing if that amount was greater than the value of the building, because there was no evidence of the value immediately before the blasting.

Unlike Caeser's Gaul, *Hanset* is only divided into two parts—the necessary part and the unnecessary one. The first half of the opinion ends with the necessary holding that "the proper measure of damages in this case is repair cost, not diminution of value." It merely followed and applied the law previously announced in *Ore. Mutual Fire Ins. Co. v. Mathis, supra.* The second half of the *Hanset* opinion is an intellectual discourse and is interesting but unnecessary to the decision.

*Hanset* did not attempt to change the law in Oregon as to the measure of damages for tortious injury to real property. Whether or not this court in a proper case will agree with

and apply the principles of law set out in Restatement (Second) of Torts Section 929 and comment *b* thereto is an open question.[8]

> *D. Should this Court, Independent of the Restatement of Torts, Allow the Cost of Restoration as the Measure of Damage when a Homestead is Completely Destroyed by Tort?*

The question narrows down to whether the proper measure of damages is the diminution in value or the cost of repair and restoration. When the property in question is not completely destroyed by the tort, the diminution in value is measured by the difference in the before and after value of the property. When the property is completely destroyed and no value remains, then it is unnecessary to go through the artificial before and after subtraction and the diminution equals the pre-tort value of the property.

We have not been cited, nor have we been able to find a case from any jurisdiction that allows the cost of restoration as the measure of damages when a homestead or personal residence has been completely destroyed by tort. As far as we can determine, other jurisdictions treat a homestead that has been completely destroyed by blasting, fire or other tort the same as any other building.[9]

In *Ore. Mutual Fire Ins. Co. v. Mathis, supra,* this court quoted from McCormick, Damages, *supra* at 482:

> "In the case of injury to some structure or improvement upon the land, such as buildings, fences, or wells, there are several methods of measurement available. *First, if the improvement is destroyed, and may readily be treated as a unit in itself, apart from the land, as in case of a house or*

---

[8] There are at least three material differences between Restatement (Second) of Torts Section 929 (1977) and existing Oregon law: (1) Although the Restatement recognizes both the diminution-in-value and the cost-of-repair rules, it does not use the temporary-permanent damages distinction to trigger the application of either rule; (2) The Restatement gives the plaintiff owner an election as to which of the two measures of damages may be applied—something that does not exist in the Oregon law; and (3) The Oregon cases are keyed to "market value," while the Restatement uses "the value to the owner" under Section 911.

[9] The shortage of cases in this area of the law may result from the fact that many homeowners may have their houses covered by replacement cost insurance. Here the Barneses in effect testified that they did not have replacement cost insurance because their concrete block house could not be destroyed by fire and they did not anticipate blasting damage.

*other building, the value of the improvement itself at the time of its destruction is usually taken as the basis of compensation,* and, in ascertaining this value, the original cost or the cost of replacement, with allowance for depreciation, may be considered. Second, if the improvement is merely damaged and not destroyed, damages are usually measured by the reasonable cost of repair or restoration to the condition before the injury, together with compensation for the loss of the use of the property during the period of repair. This formula works well enough if the injured building or improvement was a reasonably new one, though even then the jury should be warned to make a deduction from the cost of repair for the fact that the repaired part would be newer and better than the corresponding part before the injury, but, if the building is ancient and dilapidated, or not susceptible of repair, the courts are apt to prefer a different standard of recovery; that is, the amount of the lessening in value of the structure or other improvement, produced by the injury. If from the evidence the jury could ascertain both the cost of restoration, and the diminution in value due to the injury, then seemingly they should be instructed to allow damages on the basis of the reasonable cost of restoration, not to exceed the amount of the decrease in value due to the injury. Third and finally, if the improvement which has been injured or destroyed is one which does not lend itself to separate valuation, or even in the case of buildings, according to a few decisions, the general standard of the diminution in value of the land *as a whole,* resulting from the loss or injury of the improvement, may be adopted." (Footnotes omitted; first emphasis added, second emphasis in original.)

This case fits within the first McCormick rule. The Barneses have treated their house "as a unit in itself, apart from the land." We hold that the value of the house at the time of its destruction is the proper measure of damages.

This case also fits with the most recent authority that we can find on the subject. That authority is Speiser, Krause & Gans, The American Law of Torts (1985). At Section 8.36, pp 735-39, it states:

"Value of buildings and structures. A number of courts measure the damages for injury to a building either by the difference between the market value of the land before and after the injury or by the difference between the market (or actual) value of the building—considered apart from the land —before and after the injury.

"* * * * *

"Permanent or continuing injuries. The measure of damages, where real property is either damaged or destroyed, varies. In event of a mere injury or damage of a permanent nature to real property, the proper measure of damages is the diminution in the market value of the property by reason of that injury, or in other words, the difference between the value of the land before the injury and its value after the injury. If real property is taken or the value thereof totally destroyed, the owner is entitled to recover the actual cash value of the property at the time of the taking or destruction with legal interest thereon to the time of trial." (Footnotes omitted.)

The result here is exactly the same as that reached by this court in *Olds v. Von der Hellen, supra.* It is the only other case we have in which the building was totally destroyed. There we held that the measure of damages was "the value of the building at the time of the fire." 127 Or at 289.

## III. Conclusion

In connection with Wildish Construction's petition for review, we hold that the Barneses did not argue to the trial court that the proper measure of damages was the diminution in the market value of their residence. Therefore it was improper for the Court of Appeals to allow the Barneses to argue that measure of damages on appeal.

In connection with the Barneses' petition for review, we hold:

(1)    That *Hanset v. General Construction Company, supra,* did not approve Restatement of Torts Section 929 or the comments thereto;

(2)    Whether this court in a proper case will agree with and apply the principles of law set out in Restatement (Second) of Torts Section 929 and the comments thereto is an open question;

(3)    The value of the Barneses' house at the time of its alleged destruction is the proper measure of damages; and

(4)    The Barneses did not offer any proof of the pre-tort value of their house and therefore were not entitled to submit their case to the jury.

The decision of the Court of Appeals is reversed. The decision of the trial court is affirmed.

**JONES, J.,** concurring.

This case has been made unfortunately complex by the plaintiffs' asking too much and proving too little. In my opinion, plaintiffs should be entitled to the reasonable cost to repair or replace their premises so long as this cost is reasonably related to the market value of the premises. The evidence presented by plaintiffs in this case is that the cost of replacement was $228,000, with a market value of the premises of no more than $168,000.[1] Plaintiffs made no effort to reconcile these figures in a reasonable relationship and failed to prove the difference between the before- and after-market value of the premises. As a result plaintiffs will end up with nothing, when they were entitled to reasonable compensation for their loss.

**LINDE, J.,** dissenting.

The court's opinion in this case likely will not be the final word on the measure of damages for the tortious destruction of a building, particularly of an owner-occupied residence. The case is too obfuscated by problems of procedure and evidence to lend itself easily to a straightforward and clearcut analysis of that substantive issue. Some of the majority's steps on the way to its holding, however, are sufficiently doubtful to deserve separate comment.

First, the sources quoted by the majority themselves suggest that there is no settled general rule for all cases of the partial destruction of buildings. The writers content themselves with reporting what courts "usually" do, hardly an endorsement of a single analysis. For instance, the majority (306 Or at 125) underlines, in the passage from McCormick on Damages quoted in *Ore. Mutual Fire Ins. Co. v. Mathis,* 215 Or 218, 225, 334 P2d 186 (1959), the sentence that "in case of a house or other building, the value of the improvement itself at the time of its destruction is usually taken as the basis of

---

[1] As noted in the majority opinion, this amount was never proven.

compensation." "Usually" does not mean "always" or "properly."[1] Similarly, citing 4 Sutherland, Damages, the *Mathis* court stated that "there is no universal test for determining the value of property injured or destroyed and that the mode and amount of proof must be adapted to the facts of each case." *Id.* And the quotation from Speiser, Krause and Gans, The American Law of Torts, merely reports that "[a] number of courts measure the damages for injury to a building" against the prior market value.

Second, the majority says (306 Or at 121 n 7) that if the Barneses "desired to plead and prove a cause of action under the Restatement [of Torts] they should have considered" section 927, which allows recovery for destruction of property of the "value of the subject matter," and section 911 defines value to mean either exchange value "or the value to the owner if this is greater than the exchange value." It is misleading to speak of pleading a cause of action "under" Restatement section 927, as if it were an old common law form of action. If these sections are correct statements of the law, it cannot matter whether any party cites them. I agree with the Restatement that value for purposes of tort damages to an owner may not be identical with and is not limited to "exchange" or market value. When the Barneses' cross-claim alleged damages of $228,000 for the replacement of their residence, they adequately alleged a "value to the owner * * * greater than the exchange value," whether or not the entire, unmodified replacement cost was the correct measure.

Tort damages ordinarily are designed to compensate the injured party for the loss caused by the defendant's tortious conduct as determined by the factfinder upon the evidence in the particular case. A rigid formula measuring the owner's damages by what a buyer would have paid him for the property at the time of its destruction may not compensate for the loss, for two reasons. One who occupies his or her own home cannot be assumed to be in the housing market, willing to sell at a price that reflects the home's market value, nor can (or does) the tortfeasor purport to force acceptance of that price by eminent domain.

---

[1] The quoted sentence continues: "* * * and, in ascertaining this value, the original cost or the cost of replacement, with allowance for depreciation, may be considered." *Id.* Under the full sentence, direct testimony about market value is not indispensable.

Moreover, the market price at the time of the injury will not compensate the injured owner who wants to reconstruct the building if construction costs have risen, a contingency that is the rule more often than an exception. It can by no means be taken for granted that a house that had a market price of $100,000 (plus the value of its site), if rebuilt without major change at a cost of $150,000, will thereafter be saleable at $150,000. It might or might not be, depending for instance on the price at which one could buy similar houses in the neighborhood that were not destroyed and did not need to be rebuilt at the higher current cost. A house on the same site rebuilt as it was before the destructive event might bring some premium for being newer but not as much as the reconstruction costs. The risk of reasonable restoration costs beyond prior market value and not reflected in an increased new market value should not fall on the innocent owner.

It therefore is not unreasonable for an owner to demand the cost of rebuilding what he has lost, and to entitle the defendant to a reduction in this measure of damages for any amount in which the reconstruction increases the value of the property over what it was before the injury. Such an increase would be the "enrichment" of which the court spoke in *Ore. Mutual Fire Ins. Co. v. Mathis, supra,* and in *Hanset v. General Construction Company,* 285 Or 101, 104, 589 P2d 1117 (1979), and which should not be charged to the defendant's account. Also, to leave the ultimate test of value to the factfinder would not contradict *Olds v. Von der Hellen,* 127 Or 276, 263 P 907, 270 P 497 (1928), quoted by the majority. The building in that case was a business investment, not a home. More important, the *Olds* court said only that the trial court erred when it adopted a rigid measure of replacement cost reduced by some percentage for "depreciation" and "failed to consider other factors which should have entered into the determination of its value." 127 Or at 288. It did not hold that market or rental value or any other single measure was conclusive as a matter of law. The opinion said only that "these circumstances should have been considered in determining the question of value." *Id.*

I am not sure that, in trying to draw a line between "temporary" and "permanent" damage to real property, the court has adequately distinguished between land and buildings. Permanent destruction of land that cannot be restored

might be, for example, the slide of a hillside or the crumbling of a coastal bluff or riverbank; but there is no such clear distinction with respect to buildings that can be rebuilt. In the case of buildings, "temporary" and "permanent" are readily confused with "partial" and "total." The majority seems to hold that if plaintiffs claimed damages for a total loss, the destruction also must have been "permanent." But it seems artificial to make the legal formula for measuring the owner's loss shift with characterizing as "temporary" or "permanent" the harm, for instance, to a burned-out home whose foundation and brick walls are standing. If a temporal test were literally applied to buildings, repair of a heavily damaged house might well take longer (that is to say, be *less* "temporary") than to rebuild on the site.

One can conjure up hypothetical examples of unreasonable efforts to duplicate old materials or construction techniques that are not currently available and require inordinate expense. But whether such expenditures are reasonably chargeable as damages does not logically depend on characterizing the extent of the destruction, though as a practical matter a factfinder may consider it more reasonable to match expensive original parts of a partially destroyed building and unreasonable to replicate them in a reconstructed one. The point is that all these are questions of fact in determining reasonable compensation for what the owner has lost while not charging a defendant for any increased value resulting from restoration of the owner's property.

If the foregoing views are correct (and it is not wholly clear how far the majority disagrees with them, though it obviously reaches a different measure of damages), the issue reduces itself to one of burdens of going forward with evidence and of persuasion. The injured party may plead that the financial loss caused by the defendant is the cost of being restored to the pre-injury position. (The court holds that the present plaintiffs' pleading was adequate.) The plaintiff must show that cost. Evidence that reconstruction costs will not result in a more valuable house must be introduced by plaintiffs only if "the nonexistence" of this result is "essential to the claim for relief"; defendants must produce this evidence if the existence of an increased value is a defense. OEC 305, 307. It should be left to the defendant to claim and to introduce evidence that the claimed expenditures left (or would leave) the plaintiffs

with a more valuable property than it was worth at the time of the injury. The plaintiffs should not have to negate this argument in advance, but they retain the burden of persuasion on the ultimate issue of damages.

In the present case, the majority holds that plaintiffs failed to introduce evidence of the pre-injury market value of their home. I agree that they did not introduce such evidence, and if it is their burden to do so in every case, the majority is correct. But I would hold that pre-injury market value is relevant only when a defendant claims that the restored house has (or would have) a materially higher value than it had before the injury. This is not an essential part of plaintiffs' case in chief. The trial court therefore should not have directed a verdict against the Barneses at that stage of the trial. The case should be remanded for a new trial.

Lent, J., joins in this dissenting opinion.

**GILLETTE, J.,** dissenting.

The court today throws away an opportunity to take a step presaged in its opinions of the last 30 years. Because I believe we should take that step, I dissent.

As early as 1959, this court said that, in cases of tortious damage to real property,

"[because] *the allowance of damages is to award just compensation without enrichment,* there is no universal test for determining the value of property injured or destroyed and * * * the mode and amount of proof must be adapted to the facts of each case. [Citation omitted.]"

*Ore. Mutual Fire Ins. Co. v. Mathis,* 215 Or 218, 224-25, 334 P2d 186 (1959) (emphasis added). "Just compensation without enrichment" should continue to be the lodestar in such cases today. The majority agrees. 306 Or at 117. Unaccountably, however, the majority concludes in the present case that the *only way* to achieve that goal is to require the owners of the damaged property to prove the before-and-after value of their home, *i.e.,* prove the diminution-in-value of the home due to the blasting. I agree that such would be *one way* for the Barnes to prove their damages; I do not agree that it is the *only way.*

For authority, I need rely only on *Ore. Mutual Fire Ins. Co. v. Mathis, supra,* and *Hanset v. General Construction*

*Company,* 285 Or 101, 589 P2d 1117 (1979). All the pertinent language from those two opinions is to be found in the majority opinion; the majority simply misreads what the language means. This misreading is based on the majority's preoccupation with whether the injury to the property in this case was "temporary" or "permanent." Because the damage to the Barneses' house is total, the majority reasons, the injury in this case is permanent. 306 Or at 121. Therefore, the majority reasons, the rule of law applicable in permanent or total destruction of the value of real property cases is the one to apply here, and that rule applies the diminution-in-value measure of damages. 306 Or at 121-124. *See Hudson v. Peavey Oil Company,* 279 Or 3, 10, 566 P2d 175 (1977). Thus, the failure of the Barneses to offer evidence of the diminution-in-value of their home puts them out of court.

I read *Hanset v. General Construction Company, supra,* to the contrary. As the description and quotations from the case in the majority opinion show, *Hanset* was a case in which this court permitted recovery for damages due to blasting very like those in this case when the house was essentially destroyed and the only evidence offered by the plaintiffs as to their damages consisted of evidence as to how much they would be required to pay in order to repair the building. 285 Or at 104, 106-7. No amount of effort by the majority succeeds in distinguishing *Hanset* from the present case; we should follow it.

The majority apparently fears that permitting parties in the Barnes' position to survive a motion for directed verdict when their only evidence is what it would cost to replace a structure could result in unjust enrichment, or "betterment," because the usual experience is that structures have depreciated. Giving plaintiffs a new building requires a defendant to do the equivalent of buying a Cadillac to replace a Chevrolet.

There are two answers to this concern. The first is that offered in the separately dissenting opinion of Justice Linde. Proving damages by cost of repair only means that one survives a motion for a directed verdict. The defendant must then come forward with evidence, if any there be, of a value of the structure prior to its destruction which was lower than the replacement cost. The jury is then instructed under the standard of just compensation without enrichment — if it finds

the defendant's diminution-in-value evidence persuasive, it will bring in a verdict accordingly. If it does not, plaintiffs will be entitled to receive the higher figure (should the jury find it persuasive).

The second answer is that it is not necessarily true in each case that the cost of replacement will result in unjust enrichment. One can readily imagine cases in which either a rising housing market or a sudden increase in the value of having a house at the specific location where the former one was located meant that the before-destruction value of a depreciated house was equal to or even higher than the replacement cost of the house. These are jury matters. The trial court erred in ruling to the contrary, and this court errs in upholding the trial court.

I respectfully dissent.